COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-08-131-CR

 

 

TARRENCE LAMONE STEVENSON                                          APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM
CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

I. 
Introduction

In four
issues, Appellant Tarrence Lamone Stevenson appeals his murder conviction and
life sentence.  We affirm.








II. 
Procedural Background

The
State charged Stevenson with the capital murder of Syed Karim, who was shot
during the course of a convenience store robbery.  Stevenson pleaded not guilty.  A jury found him guilty of murder and
sentenced him to confinement for life, and the trial court entered judgment on
that verdict.  This appeal followed.[1]

III. 
Sufficiency of the Evidence

In his
first issue, Stevenson complains that the evidence is legally and factually
insufficient to convict him of murder. 

As an
initial matter, the State contends that Stevenson forfeited this complaint
because he did not object to the submission of murder as a lesser-included
offense and accepted the benefits of that charge.  To support its argument, the State refers us
to State v. Lee, 818 S.W.2d 778, 781 (Tex. Crim. App. 1991), and Bradley
v. State, 688 S.W.2d 847, 853 (Tex. Crim. App. 1985), both of which the
State acknowledges were overruled on other grounds by Moore v. State,
969 S.W.2d 4, 10 (Tex. Crim. App. 1998).








Stevenson
has not forfeited this complaint.  In McKinney
v. State, the court of criminal appeals addressed Bradley and Lee,
stating:

[b]ecause the concern is ensuring that the essential elements of the
offense are proven beyond a reasonable doubt, it makes little sense to preclude
a defendant from challenging the legal sufficiency of the evidence on appeal
simply because he requested and received an instruction on a lesser‑included
offense.  Likewise, it makes little sense
to extend the estoppel rule to preclude a defendant from challenging the
factual sufficiency of the evidence.

 

Thus, we
hold that the estoppel rule will not be applied to all criminal cases where the
legal sufficiency of the evidence is challenged and a lesser‑included
offense instruction is requested and received, nor should the rule be extended
to preclude challenges to factual sufficiency. 
On the contrary, application of this estoppel rule should be confined
exclusively to the limited number of cases that challenge the sufficiency of
the evidence as it relates to the sudden‑passion element of voluntary
manslaughter and that arose before September 1, 1994. 

207 S.W.3d 366, 374 (Tex. Crim.
App. 2006) (emphasis added).[2]

A.  Standards of Review








In
reviewing the legal sufficiency of the evidence to support a conviction, we
view all of the evidence in the light most favorable to the prosecution in
order to determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,
319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235 S.W.3d 772, 778
(Tex. Crim. App. 2007).  Furthermore, we
must consider all the evidence admitted at trial, even improperly admitted
evidence, when performing a legal sufficiency review.  Clayton, 235 S.W.3d at 778; Moff v.
State, 131 S.W.3d 485, 489B90 (Tex.
Crim. App. 2004).  The standard of review
is the same for direct and circumstantial evidence cases; circumstantial
evidence is as probative as direct evidence in establishing an actor=s
guilt.  Clayton, 235 S.W.3d at
778; Hooper v. State, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007).








When
reviewing the factual sufficiency of the evidence to support a conviction, we
view all the evidence in a neutral light, favoring neither party.  Steadman v. State, 280 S.W.3d 242, 246
(Tex. Crim. App. 2009); Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim.
App. 2006).  We then ask whether the
evidence supporting the conviction, although legally sufficient, is
nevertheless so weak that the factfinder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
factfinder=s determination is manifestly
unjust.  Steadman, 280 S.W.3d at
246; Watson, 204 S.W.3d at 414B15,
417.  To reverse under the second ground,
we must determine, with some objective basis in the record, that the great
weight and preponderance of all the evidence, although legally sufficient,
contradicts the verdict.  Watson,
204 S.W.3d at 417.

Unless
we conclude that it is necessary to correct manifest injustice, we must give
due deference to the factfinder=s
determinations, Aparticularly those
determinations concerning the weight and credibility of the evidence.@  Johnson v. State, 23 S.W.3d 1, 9 (Tex.
Crim. App. 2000); see Steadman, 280 S.W.3d at 246.  Evidence is always factually sufficient when
it preponderates in favor of the conviction. 
Steadman, 280 S.W.3d at 247; see Watson, 204 S.W.3d at
417.








In
determining whether the evidence is factually insufficient to support a
conviction that is nevertheless supported by legally sufficient evidence, it is
not enough that this court Aharbor a
subjective level of reasonable doubt to overturn [the] conviction.@  Watson, 204 S.W.3d at 417.  We cannot conclude that a conviction is
clearly wrong or manifestly unjust simply because we would have decided
differently than the jury or because we disagree with the jury=s
resolution of a conflict in the evidence. 
Id.  We may not simply
substitute our judgment for the factfinder=s.  Johnson, 23 S.W.3d at 12; Cain v.
State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a different
result is appropriate, we must defer to the jury=s
determination of the weight to be given contradictory testimonial evidence
because resolution of the conflict Aoften
turns on an evaluation of credibility and demeanor, and those jurors were in
attendance when the testimony was delivered.@  Johnson, 23 S.W.3d at 8.  Our deference in this regard safeguards the
defendant=s right to a trial by jury.  Lancon v. State, 253 S.W.3d 699, 704
(Tex. Crim. App. 2008).  A factual
sufficiency review of circumstantial evidence is the same as a review of direct
evidence.  King v. State, 29
S.W.3d 556, 565 (Tex. Crim. App. 2000); Kutzner v. State, 994 S.W.2d
180, 184 (Tex. Crim. App. 1999) (reasoning that A[c]ircumstantial
evidence, by itself, may be enough to support the jury=s
verdict@). 

B.  Murder








The jury
convicted Stevenson of felony murder.  See
Tex. Penal Code Ann. ' 19.02(b)(3) (Vernon
2003).  The indictment charged him with
intentionally causing the death of Sayed Karim by shooting him with a firearm
during the course of committing or attempting to commit the offense of robberyCthat is,
capital murder.  See id. ' 19.03(a)(2)
(Vernon Supp. 2009).  Murder is a
lesser-included offense of capital murder, and a lesser-included offense
instruction on felony murder was included in the trial court=s charge
to the jury, as well as an instruction on the law of parties.  Id. ' 7.01
(Vernon 2003), '' 19.02(b)(3), 19.03(c).  A person commits felony murder if he commits
or attempts to commit a felony (i.e., robbery) and, in the course of and in
furtherance of the commission or attempt, or in immediate flight therefrom, he
commits or attempts to commit an act clearly dangerous to human life that
causes the death of an individual.  Id.
' 19.02(b)(3).  Under the law of parties, A[a]
person is criminally responsible as a party to an offense if the offense is
committed by his own conduct, by the conduct of another for which he is
criminally responsible, or by both.@  Id. ' 7.01(a).

C.  Evidence at Trial

1.  Crime Scene

a.  The Shooting

The
murder of Sayed Karim occurred on the night of April 13, 2005, at Terry=s Food
Mart on Hemphill Road in Fort Worth. 
Patrick Kilpatrick and his wife, Brenda,[3]
testified that they stopped at the store around 10:20 p.m. so that Patrick
could talk with Karim about a used big screen television that Karim wanted to
purchase.  While Patrick and Karim talked
at the counter, Brenda went to get herself a Pepsi and a six-pack of beer for
Patrick. 








As
Brenda started to pay for their beverages, two black men entered the store and
one screamed, AThis is a robbery, fools!@  Patrick described the two men as wearing
black clothingChooded sweatshirts and ski-type
masks Alike
those insurgents [in Iraq].@  Brenda testified that all she could see were
their eyes.  The shorter man, standing in
front of Karim, had a gun.  The taller
man stood facing the door on the opposite side of the store, by the beer
cooler.  Patrick and Brenda both
testified that there was also a third man in the store, a young black male who
was not wearing a mask, had hair in braids with beads, wore a Cleveland Browns
football jersey, and did not appear to them to be involved in the robbery.  Patrick testified that Stevenson was not the
young man with the braids.

Brenda
testified that at the gunman=s order
Karim immediately opened the cash register, pulled out the till, and threw it
on the counter.  Patrick testified that
Karim pleaded for his life after he put the cash drawer on the counter, but the
gunman demanded more.  Brenda backed
away, ran into a store employee, and got behind one of the aislesCshe used
the employee=s cell phone to call 911.  Patrick got behind one of the other aisles
and used his cell phone to call 911.

Brenda
testified that she did not see Karim get shot but that she saw him stagger from
behind the counter after the gunman shot him and that he was holding his side
and Athere
was blood everywhere.@ 
Patrick testified that Karim yelled for someone to call 911 and then
fell to the floor.  Karim actually
managed to call 911 himself. 








Grant
Fredericks, a forensic video analysis expert, testified that he overlaid the
911 calls onto the surveillance videotape and developed powerpoint slides from
the video images.  Fredericks played the
videotape with the three 911 calls for the jury, describing the events as
follows:

$       
The first male enters at 10:40:42 p.m. and retrieves something from the
cooler.  He has Alittle reflective events
in his hair.@  He is taller than five feet, eight inches Aprobably by several
inches.@

 

$       
The second male enters twenty seconds later, at 10:41:03.  He is significantly shorter than the other
two males.  At 10:42:09, he is in front
of the counter and moves an object in his right hand pointed directly at the
clerkCAas we follow and track
this object, it=s obviously the gun and
it=s eventually fired.@

 

$       
The third male enters behind the second male.  Both the second and third males are wearing
things that cover their heads.

 

$       
At 10:41:50, Karim pulls the cash drawer out.  The shot is fired at 10:41:53. 

 

$       
After the second male fires the shot, he disappears from the camera=s view.  The first male reaches on the counter and
appears to sweep the objects, the money that remained on the counter, off the
counter and follows the second male.

 

b.  The Escape








Gabriel
Rojas testified that he witnessed the shooting from inside his carChe had
driven to the convenience store to pick up some things for his grandfather and
saw a man dressed all in black emerge from the store.  Then, as he pulled in, he saw another man,
wearing a black, hooded sweater, pointing a gun at the clerk.  He then backed his car up, heard a gunshot,
and pulled into the Shell gas station next door, where he saw a black carCwhat he
thought was a four-door Toyota CamryCparked
next to the car wash.  He saw a man with
a black hood run towards the passenger side and get inside the vehicle.  He testified that there had been three men in
black:  the one who left, wearing a
sweater; one in the back of the store next to the beer cooler; and the one with
the gun.

Kristen
Pyles testified that she stopped at the Shell station and saw a parked,
dark-colored, four-door car, which she described as Aan older
Honda or something.@ 
She testified that she almost hit two men running to the vehicleCthey
were wearing dark-colored hoodies and at least one had a mask on.  Both entered the dark carCone into
the front passenger side and one into the back passenger side.  She testified that the one that entered the
front passenger seat looked like he was carrying a case of beer or box of some
sort.








Detective
Pat Henz testified that he arrived at the crime scene around 11:25 p.m.  He took photos and located and collected a
fired shell casing and a fired bullet projectile; he was with one of the other
detectives who collected the surveillance videotapes.  He testified that he found no fingerprints of
any value.[4]  He returned to the scene a few months later
to take additional photos.

2.  Other Evidence

Detective
Jose Hernandez testified that various tips led to Amanda Bivins and her car, a
black 1998 four-door Oldsmobile Cutlass, and to the three men who were
arrested:  Stevenson, Darrell ABoo@ Bell,
and Julian Hayley.  He testified that
Stevenson was five feet, seven inches and 150 pounds; Hayley was five feet,
nine inches and 140B150 pounds; and Bell was five
feet, ten inches and 160 pounds.








Bivins
testified that in 2005, she used crack cocaine and would Abasically
rent [to Bell her] car in exchange for the drugs.@  She knew Hayley, Stevenson, and Lloyd ATwin@
Meredith through BellCall three lived near BellCand she
took drugs with Meredith.  On April 13, 2005,
when it was getting dark, she and Bell went to a house on Bandy Avenue; Bell
drove her car.  She waited in the car
while Bell went inside.  He emerged with
Stevenson and HayleyCthey were all wearing blackCand Bell
got back into the driver=s seat.  Hayley and Stevenson climbed into the back
seat; Bell tossed a black handgun into Bivins=s lap
and said, AHere, hold this.@ 

Bivins
testified that she asked whether the gun was loaded and Stevenson told her that
the gun had a bullet in the chamber. 
When she asked if anyone was going to get shot, he told her noCit was Ajust in
case.@  She testified that she knew they planned to
rob a store, but she did not know which oneCshe
stayed at Meredith=s house and they took her
car.  Her concern at the time was that
they were Aprobably fixing to get money and
that [she] would be able to get high.@ 

Bivins
testified that Bell returned her car around thirty minutes later and that it
was followed by a light-colored Lincoln Town Car.  A cash register till was in the front seat of
her car and a black sweat shirt was in the back seat.  Bell gave her $20 and then left in the
Lincoln.  Bivins pulled her car into
Meredith=s
driveway, and Meredith, with gloves on, got the cash register till, a sweat
shirt, and a ski mask out of her car and placed them in the trash.  Then Bivins went driving around to look for
Bell because she wanted more money or drugs, but she did not find him that
night. 








Instead,
Bivins saw Stevenson in front of the house on Bandy Avenue, by the Lincoln or
in the Lincoln, a couple of hours later and asked him where they had gone.  He told her, ATerry=s Food Mart
on Hemphill.@ 
When she asked if anyone had been shot, he told her that he shot at
somebody Ato scare them, but [he] didn=t shoot
anybody.@  The next day, she saw on television a report
that Terry=s Food Mart had been robbed and
that a man had been murdered.

Five
days later, the police pulled over her carCShawntee
Abbs and two others were with her. 
Bivins identified Bell, Stevenson, and Hayley in photo lineups.  Bell wore his hair in braids at the time.  Bivins testified that the police who
interviewed her brought up Bell=s,
Hayley=s, and
Stevenson=s names and Aknew
quite a bit@ about what had happened.  She gave consent to search her vehicle, even
though she knew they would find illegal narcotics in it, and she gave a
statement.  She testified that she
received an immunity agreement but had been willing to testify without it.  Defense counsel entered the immunity
agreement in evidence.

Bivins
testified that she watched the surveillance videotape from Terry=s Food
Mart and that she recognized Bell.  He
went to the beer cooler and A[i]t
showed him walking off the camera and then it showed him walking back up to the
counter and getting some money that was just laying on the counter by itself.@  She could not say with certainty who the other
people in the video were. 








Bivins
testified that she subsequently acquired criminal charges in New Mexico, where
she had moved in June 2005 to try to become drug-free, after being beaten up
after talking to the police in April 2005. 
She had been off drugs for a little over a year by the time she
testified.

Abbs
testified only after she was located, arrested, and brought to court. She
identified the individual in State=s
Exhibit 23 as Bell, the individual in State=s
Exhibit 24 as StevensonCsomeone who lived in her
neighborhoodCand the individual in State=s
Exhibit 25 as Hayley.  Abbs claimed that
she did not recall talking to a female detective on April 18, 2005, and that
she did not recall making her statement, although she acknowledged that the
signature and handwriting on State=s
Exhibit 44 did Alook like [her] handwriting.@  

Abbs was
a very hostile witness, complaining at one point, AI don=t care
about this because y=all putting me in some stuff I
ain=t got
nothing to do with.  I ain=t the
one that went with them to rob that damn store.@  She acknowledged that she had identified and
initialed her identification of Stevenson, Bell, and Hayley in photo lineups,
but she stated that all she had heard were rumors about the robbery.[5]  The trial court included a limiting
instruction on impeachment in the jury charge, and it gave a limiting
instruction with regard to the following questioning:








[State=s counsel]:  Ms. Abbs, do you recall hearing from: I heard
T.T. say something like do you remember when I busted a cap at thatC

 

[Defense counsel]:  . . . My
objection is this should only go as to impeachment unless the witness clearly
remembers.

 

. . . .

 

The Court:  Yeah.  The statement that=s being made now is just
for impeachment purposes only.  Not for
the truth or the probative value of it.

 

. . . .

 

[State=s counsel]:  Ms. Abbs, do you recall hearing an individual
you labeled in the statement as T.T., the same person you pointed out here in
the courtroom today, say something like, [A]You remember when I busted at that,[A] and you usedCyou put the N word out in
quotes?

 

[Abbs]:  I remember hearing
something like that.  I don=t remember whose mouth it
came out of.  Because there was a lot of
rumors coming and going around the hood at the time. . . .  I don=t remember, but they asked me to write something
down, you know what I=m saying?  But I don=t remember whatCwhat . . . .  Yeah, this might be my hand printing on this
paper[,] . . . but I don=t remember saying that
stuff.

You got evidence, y=all said I talked to that
lady over there on Belknap . . . [w]ell, let her sit in here tell you if y=all got any evidence . .
. .

 

[State=s counsel]:  Detective . . . Waters and Detective Carroll
are the next two witnesses. . . .

 

[Abbs]:  That=s cool. 

 

[State=s counsel]:  Now, that=s your handwriting, correct?  Yes or no?








[Abbs]:  Do I have to answer
this, Judge?

 

The Court:  You told him that=s your handwriting,
correct?

 

[Abbs]:  Yeah.  And I told him yeah.  Why he keep asking me that?  He getting on my nerves.  He=s fixing to make me mad.  You know what I=m saying?  I sure hate to start cussing and acting a
fool.  I don=t know.

 

The Court:  You=re not
going to start cussing and acting a fool.

Detective
Michael Carroll testified that he and Detective Sara Jane Waters interviewed Abbs
on April 18, 2005, and that Abbs was extremely reluctant to talk with
them.  He stated, AIt was
obvious that she reallyCshe knew information but really
didn=t want
to give the information to us for fear that she may be injured or hurt.@  Detective Waters also testified that Abbs was
very reluctant and that they did not force her to make her statement.  Detective Waters read Abbs=s
redacted statement in evidence, which in pertinent part stated:

For about the past year I=ve been friends with a
guy I know as Boo.  I don=t know his real
name.  He stays somewhere on Savage
[Drive] with his grandmother.  Boo hangs
out a lot on Bandy [Avenue] at Julian=s house . . . . 
Boo has been dating Amanda[,] a white girl I know.

 

On Tuesday, April 12th, 2005, at about 9:30 or 10
that night[,] me, Boo, M=Kail, my sister Marian,
and my big brother Bruce were all at my house on Glasgow [Road].  When he finally left, it was two in the
morning.  He was on foot.  I didn=t know where he went.

 








The next time I saw Boo was on Thursday about
noon . . . .  Boo was across the street
and I called him over.  I gave him 50
cents and asked him to buy a cigar for me. . . . 

 

By then we were at Julian=s house and we went
inside.  Julian and [Stevenson] were
already there and so was my little sister Marian and some mixed-race boy that I
don=t know his name. 

Julian was falling asleep on the sofa. [Stevenson] w[as] talking about
what they did.  I heard [Stevenson] say
something like[, A]do you remember when I
busted at that n[*****].[A] [Stevenson] was talking
about having a box of squaresCcigarettes, and Marian asked him where he got the
money for squares.  He said he didn=t have no more money
because he spent it on a gaugeCa shotgun.

 

She already knew where he had gotten the money
because she heard him talking about the store he had robbed.  We were only there for about 45 minutes when
Amanda pulled up to pick us up.  We got
into her car, which is a black four door. 
We dropped him off on Savage [Drive] and he gave me $10 when he got
out.  He didn=t say what it was
for.  He just got out of the car without
saying anything else to Amanda because . . . he knew she was mad at him.

 

. . . Amanda pulled up about 30 minutes
later.  She showed me the newspaper
article about the robbery and murder on Hemphill.  I knew then that it was the store that Boo,
[Stevenson], and Julian had robbed.

 

. . . I didn=t see Boo again until today.  When I got home at 2:30 this afternoon he was
there.  Saw that he had a whole bunch of
10s and 20s and stuff.  He had maybe a
couple of a hundred dollar bills, too, but I didn=t get a real good look.

 

I don=t know . . . [Stevenson=s] real name or Boo=s, but I did pick out
pictures of them in the photo spreads I was shown.

 








In handwriting, Abbs=s
redacted statement contained the following: 
AThere=s a
number . . . and then it says >my phone= and the
number sign.  And then it says: T.T., we
were talking about the robbed store and got the money.  T.T. told me that he had shot at somebody or
shot somebody when he said [>]I bust
at that n[******].[>]@  Detective Waters testified that she watched
Abbs write this on her statement.

Meredith
testified that he and Bivins used to do cocaine together.  He testified that Terry=s Food
Mart was only a seven-to-ten minute trip from his neighborhoodChe lived
on Savage DriveCand that Stevenson, Bell, and
Hayley were Asome kids from the neighborhood.@  He testified that Bell wore his hair in
braids, that Stevenson was the shortest of the three Akids,@ and
that Bivins had a black, small to mid-sized car.

On April
13, 2005, Bivins and Bell arrived at Meredith=s house
a little before dark; Bivins remained there for around an hour after Bell left
with her car.  When Bell returned in
Bivins=s car,
Hayley was with him; another vehicle, a light-colored Lincoln, was behind them,
with AAnt@ driving
and Stevenson in the back seat.  Meredith
took an empty cash register till that was handed to him and put it in his trash
can.  He testified that Bell and Hayley
were Aan
adrenaline flow type@ hyper; Bell gave Bivins $20,
and then Bell, Hayley, and Stevenson left in the Lincoln.  Meredith admitted to his criminal history.








Dr. Mark
Krause, Tarrant County Deputy Chief Medical Examiner, testified that he
performed the autopsy on Karim and ruled that the manner of death was a
homicide.  The cause of death was
laceration of Karim=s heart due to a gunshot wound
to the chest.  He testified that if the
bullet Ahad been
about an inch and a half further forward it would have missed him completely.@

The
State entered in evidence a pro se motion filed by Stevenson while he was in
jail awaiting trial, complaining of excessive bail and requesting a reduced
amount of bond.  The motion states in
pertinent part:

Comes now Tarrence L. Stevenson, No. 0653620, Defendant in the above entitled
and numbered cause and moves the Court toCto grant a writ of habeas corpus and . . . in
support of such motion shows.  Your
Honor, I am legally restrained, confined in the county jail . . . .  

 

Your Honor, I am charged with the offense of
murder (cap), by Indictment No. 0974892, pending in . . . Court of Tarrant
County, Texas. . . .  And Applicant was
arrested on April 14, 2005.  Your Honor,
I have been in custody for failure to enter into bail on said charge in the
amount of 250,000. . . .  

 

. . . .

 

Your Honor, I am 17, about to turn 18 on the 13th
of September and I am a life-long resident of Fort Worth, Texas.  And I haveChave currently enrolled in GED classes since I=ve been
incarcerated.  I have a very well
Christian oriented family willing to . . . go the extra mile to get me in the
right direction, sir . . . . 

 

. . . Your Honor, my mother is also a hardworking
mother of three children who does her best to assure of my well being.  I=m her youngest child and I know I=ve made my family ashamed
of my fatal mistake, Your Honor.  Sir . .
. since I=ve been in jail, Your
Honor, I have really come to understand my serious mistake in life, Your Honor
. . . . 

 








Your Honor, I=m not a bad human being.  I made a bad decision back in April and I am
sorry for [the] wrong I=m accused of, sir.  

 

. . . Respectfully submitted this 24th day of
August, 2005.  Signed Tarrence Stevenson.

 

D.  Sufficiency Analysis

Stevenson
complains that there is no direct evidence that he was involved in the robbery
and Karim=s shooting, stating that there
were A[n]o
fingerprints, no clear images of the participants, no gun recovered, no money
or till recovered, no correct identification of the involved vehicle, no
clothing, no co-defendant testimony[,] and so forth.@  He argues that the only evidence connecting
him to the robbery is a motion for habeas corpus relief that he did not adopt,
Abbs=s
redacted statement, and the testimony of Bivins, a confessed drug user.

1.  Legal Sufficiency








Notwithstanding
the absence of fingerprints, the gun, the till, the clothing, and co-defendant
testimony, viewing the above evidence in the light most favorable to the
prosecution, we conclude that a rational trier of fact could have found the
essential elements of felony murder beyond a reasonable doubt such that the
evidence is legally sufficient.  See
Jackson, 443 U.S. at 319, 99 S. Ct. at 2789; Clayton, 235 S.W.3d at
778.  To convict Stevenson of felony
murder, the jury had to conclude beyond a reasonable doubt that, either acting
alone or as a party or conspirator, and in the course of committing or
attempting to commit a robbery, Stevenson shot a firearm at or in the direction
of Karim, Aan act clearly dangerous to
human life@ that caused Karim=s
death.  See Tex. Penal Code Ann. ' 19.02(b)(3).


Brenda
and Patrick Kilpatrick testified that, during the course of a robbery of Terry=s Food
Mart, Karim was shot by the shortest individual involved in the robbery.  Several people testified at trial that
Stevenson was the shortest of Stevenson, Bell, and Hayley.  Bivins testified that Stevenson told her the
gun was loaded before he left with Bell and Hayley, and that when she asked
Stevenson where they had gone, he told her, ATerry=s Food
Mart on Hemphill,@ and told her that he shot at
somebody Ato scare them, but [he] didn=t shoot
anybody.@  The medical examiner testified that the
bullet would have missed Karim if it Ahad been
about an inch and a half further forward,@ and
that the gunshot wound to the chest killed him. 
We overrule this portion of Stevenson=s first
issue.

2.  Factual Sufficiency








Viewing
all the evidence in a neutral light, we also conclude that the evidence is
factually sufficient.  With regard to the
lack of fingerprints, Detective Henz, who testified that he had a master=s peace
officer certificate and that he taught crime scene courses to academy recruits,
gave extensive testimony about what a fingerprint of Avalue@ would
consist of, testified that he tested for fingerprints Aany spot
that we would have been made aware of that somebody came in and touched,@ and
explained to the jury that he did not find any fingerprints of any value.  The fact that the police were unable to
recover the till was explained by Meredith, who testified that he placed it in
his garbage can.  The absence of the
moneyCthe
purpose of the robberyCand the absence of the gunCthe
instrument of death according to the medical examiner=s
testimonyCmake no difference in the
analysis when circumstantial evidence, by itself, can be enough to support the
jury=s
verdict.  See Kutzner, 994
S.W.2d at 184.  Patrick and Brenda both
testified that the gunman demanded money, received it, and shot Karim.

In
addition to the testimony above, the jury was made aware of Patrick and Brenda=s
criminal histories, but they also considered testimony and audio-visual
evidence presented by Fredericks, the forensic video analysis expert, that
corroborated Patrick=s and Brenda=s
testimonies about the events that night at Terry=s Food
Mart.








The jury
was also made aware of Bivins=s
immunity agreement and history of drug abuse, but the testimony she gave about
renting her black four-door car in exchange for drugs was corroborated with
testimony by Rojas who saw a black four-door car parked at the Shell station
next door to Terry=s Food Mart on the night in question
and also saw a man with a black hood run toward the passenger side of the
vehicle and get inside.  Bivins=s
testimony also matched up with Pyles=s
testimony about seeing a parked, dark-colored, four-door car at the Shell
station that night and about nearly hitting two men in dark hoodies who were
running to the vehicle.  The jury could
have reasonably disregarded Pyles=s and
Rojas=s
identifications of the vehicle as other than an Oldsmobile Cutlass, given that
they saw the vehicle at night under stressful circumstancesCRojas
heard the gun that killed Karim go off, and Pyles nearly hit the robbers with
her car.  The jury also heard Bivins
testify that she would have been willing to testify without an immunity
agreement, and we must give due deference to the jury=s
determinations concerning the weight and credibility of such testimony.  See Johnson, 23 S.W.3d at 9. 








Even
without Abbs=s written statement, in which
she stated that she heard Stevenson talk about Abust[ing]
at@
somebody and talking about the store he had robbed, which was read in evidence
by the officer who took the statement, and the statements in Stevenson=s pro se
motion about his Afatal mistake,@ his Abad
decision back in April,@ and how he was sorry for the
wrong he was accused of, we conclude that the evidence was not so weak that the
jury=s
determination is clearly wrong and manifestly unjust, or that conflicting
evidence so greatly outweighs the evidence supporting the conviction that its
determination is manifestly unjust.  See
Lancon, 253 S.W.3d at 704; Watson, 204 S.W.3d at 414B15,
417.  We overrule the remainder of
Stevenson=s first issue.

IV. 
Evidentiary Objections

In his
remaining three issues, Stevenson complains that the trial court erred when it
admitted the following evidence:  Aa
document . . . which contained statements against interest but [was] in fact a
legal pleading@; Aout of
court statements of a reluctant witness@; and Athe testimony
of an expert witness over a Daubert objection.@

A.  Standard of Review

An
appellate court may not disturb a trial court=s
evidentiary ruling absent an abuse of discretion.  Winegarner v. State, 235 S.W.3d 787,
790 (Tex. Crim. App. 2007).  In other
words, as long as the trial court=s
decision was within the zone of reasonable disagreement and was correct under
any theory of law applicable to the case, it must be upheld.  Id. (citing Montgomery v. State,
810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh=g)).  This is so because trial courts are usually
in the best position to make the call on whether certain evidence should be
admitted or excluded.  Id.

 








B.  Motion for Bail Reduction

Stevenson
complains that the trial court erred by admitting a pro se motion for writ of
habeas corpus for bail reduction that he filed prior to trial, which he signed
but which was allegedly authored by another inmate.  The pertinent contents of the motion are set
out in our recitation above, and the trial court stated that it was admitting
the motion Abased upon 803.24, statement
against interest.@

Stevenson
complains that the motion should not have been admitted under rule 803(24)
because it was not corroborated and because the trial court failed to address
the motion=s trustworthiness.  Stevenson is correct that the statements
should not have been admitted under rule 803(24)Cthe
underlying premise of that rule is that the statements were made by a third
person, not by the accused.  See
Spivey v. State, 748 S.W.2d 18, 19B20 (Tex.
App.CHouston
[1st Dist.] 1988, no pet.).  








Nonetheless,
the trial court did not abuse its discretion by admitting the motion because
the statements in the motion were admissible under rule 801(e)(2) as statements
by a party-opponent.  See Tex. R.
Evid. 801(e)(2)(A)B(B) (reciting that a statement
is not hearsay if the statement is offered against a party and is the party=s own
statement in either an individual or representative capacity or a statement of
which the party has manifested an adoption or belief in its truth); McNair
v. State, 75 S.W.3d 69, 72 (Tex. App.CSan
Antonio 2002, no pet.) (ARule 801(e)(2)(A) plainly and
unequivocally states that a criminal defendant=s own
statements, when being offered against him, are not hearsay.@); see
also Moore v. State, 999 S.W.2d 385, 401 (Tex. Crim. App. 1999) (ABy
signing Detective Holguin=s transcription of the oral
statement, appellant manifested an adoption or belief in its truth.@),
cert. denied, 530 U.S. 1216 (2000); Trevino v. State, 991 S.W.2d
849, 853 (Tex. Crim. App. 1999) (disavowing any precedent indicating that the
statement of a party, when being offered against him, is hearsay).  Because Stevenson signed the motion, thereby
adopting the statements contained therein as his own, the statements were
admissible against him as admissions by a party-opponent.  Therefore, on this basis, the trial court did
not abuse its discretion by admitting the motion in evidence.  See Winegarner, 235 S.W.3d at 790
(stating that we must uphold the trial court=s
decision if it was correct under any theory of law applicable to the
case).  








We must
next consider Stevenson=s argument that the motion was
inadmissible under Simmons v. United States.  390 U.S. 377, 88 S. Ct. 967 (1968).  Simmons involved testimony given by a
defendant in support of his motion to suppressChe
testified that he owned a suitcase containing 
incriminating materials in order to show that he had standing to bring
his motion.  Id. at 390B91, 88
S. Ct. at 974B75.  That testimony was later admitted at his
trial and was instrumental in convicting him. 
Id. at 389, 88 S. Ct. at 974. 
The Supreme Court reversed the conviction, holding, A[W]hen a
defendant testifies in support of a motion to suppress evidence on Fourth
Amendment grounds, his testimony may not thereafter be admitted against him at
trial on the issue of guilt unless he makes no objection.@  Id. at 394, 88 S. Ct. at 976. 








One of
our sister courts has extended Simmons to hold that Aa
defendant may testify in a bail hearing regarding his ability to make bail
without subjecting himself to cross-examination on the nature and circumstances
of the offense with which he is charged.@  Ex Parte Homan, 963 S.W.2d 543, 544 (Tex.
App.CTyler
1996), pet. dism=d,
improvidently granted, 962 S.W.2d 599 (Tex. Crim. App. 1998); see
also Avila v. State, 856 S.W.2d 260, 261 (Tex. App.CEl Paso
1993, pet. ref=d) (citing Simmons for
the proposition that a person may not be required to surrender one
constitutional right to assert another with regard to testifying about the
voluntariness of her statement outside the jury=s
presence).   But see United States v.
Ingraham, 832 F.2d 229, 237 (1st Cir. 1987) (describing bail hearings as Aa
fundamentally different breed of cat@ from
suppression hearings in that the accused=s bail
rights are not so contingent on his ability to speak without fear of the future
use of his testimony that he must be granted a blanket immunity from use of all
statements made during an initial hearing, particularly as the information may
in large part be concerned with the accused=s
employment record, family status, ties to the community, and information about
the charged crime can usually be obtained from sources other than the accused=s own
testimony), cert. denied, 486 U.S. 1009 (1988); United States v. Dohm,
618 F.2d 1169, 1173 (5th Cir. 1980) (en banc) (ATestimony
required at a fourth amendment suppression hearing differs in nature from that
required at a bail bond hearing.@).








Here,
Stevenson voluntarily submitted a motion for reduction of bond, upon which no
hearing was held.  Because there was no
hearing on the motion, Stevenson was not subjected to cross-examination on the
offense=s nature
and circumstances.  Cf. Homan, 963
S.W.2d at 544.  And based on the rules
for fixing the bail amount, Stevenson was not required to include any of the
controversial statements in order to request a reduced bail amount.[6]  See Tex. Code Crim. Proc. Ann. art.
17.15 (Vernon 2008) (setting out the rules for fixing the bail amount,
including the nature of the offense and its circumstances, the ability to make
bail, and the future safety of the community). 
Here, although Stevenson may have believed these statements would help
him get a reduced bond, he was not actually faced with being forced to choose
between basic constitutional rights (that is, between suppression and
self-incrimination, or between reduced bail and self-incrimination).  Under these facts and circumstances, Simmons
and its underlying reasoning are inapplicable. 
We overrule Stevenson=s second
issue.

C.  Reluctant Witness

In his
third issue, Stevenson argues that the trial court erred by admitting Abbs=s
statement because Abbs did not adopt the language of her statement, its
admission was contrary to the trial court=s
impeachment instruction, and it contained hearsay that the defense was not able
to cross-examine.








Preservation
of error is a systemic requirement that this court should review on its own
motion.  Archie v. State, 221
S.W.3d 695, 698 (Tex. Crim. App. 2007); Jones v. State, 942 S.W.2d 1, 2
n.1 (Tex. Crim. App. 1997).  Among other
methods to preserve a complaint for our review, a party must have presented to
the trial court a timely objection, which the trial court then ruled on.  See Tex. R. App. P. 33.1(a)(1)B(2);  Mendez v. State, 138 S.W.3d 334, 341 (Tex.
Crim. App. 2004); Mosley v. State, 983 S.W.2d 249, 265 (Tex. Crim. App.
1998) (op. on reh=g), cert. denied, 526
U.S. 1070 (1999).  And to preserve error,
a party must continue to object each time the objectionable evidence is
offered.  Fuentes v. State, 991
S.W.2d 267, 273 (Tex. Crim. App.), cert. denied, 528 U.S. 1026 (1999); Ethington
v. State, 819 S.W.2d 854, 858B59 (Tex.
Crim. App. 1991).  A trial court=s
erroneous admission of evidence will not require reversal when other such
evidence was received without objection, either before or after the
complained-of ruling.  Leday v. State,
983 S.W.2d 713, 718 (Tex. Crim. App. 1998); Johnson v. State, 803
S.W.2d 272, 291 (Tex. Crim. App. 1990), cert. denied, 501 U.S. 1259
(1991), overruled on other grounds by Heitman v. State, 815 S.W.2d 681
(Tex. Crim. App. 1991). 








The
trial court admitted State=s
exhibits 44 and 63 (a copy of Abbs=s
statement and the original) over Stevenson=s
objections that they constituted hearsay and violated the Confrontation Clause
under Crawford v. Washington, 541 U.S. 36, 59, 124 S. Ct. 1354, 1368B69
(2004).  After the trial court overruled
the objections, Stevenson requested a limiting instruction on impeachment.  The trial court stated, AYes.  And I=ll also
include it in my charge.@[7]  However, after Abbs=s
testimony, the parties had the following conversation about the statement
outside the jury=s presence:

The Court:  All right.  I have the statement, that is Exhibit 63,
[defense counsel] has highlighted some statements attributed to someone other
than his client and ask[s] that we take those statements out or black them out.

 

. . . .

 

[State=s counsel]: I have no
problem with everything you=ve highlighted that=s typed.

 

[Defense counsel]:  All right.

 

[State=s counsel]:  The State=s problem is [the handwritten portion is] talking
about your client . . . and we=d object because now it=sCon [the] grounds that it=s too late to begin
with.  But we=re being nice andCand not protesting for
that.  But we wouldCthat=s part of your client,
she=s talking specifically
about Boo and T.T. in combination . . . 

 

[Defense counsel]: . . . .  My
purpose was to identify those sections in which they are statements attributed
to Boo or Julian, which wouldCeven if this witness had adopted them, would be
hearsay. . . . Just to be more specific, the handwritten portion over which we
now, I think, dispute says Boo-N-T-T, which I=m going to interpret to
mean Boo and T.T., were talking about how they robbed the store and got the
money, period. 

 

. . . .

 








The Court:  All right.  Well, I=ve already admitted 63 and 44.  Now, if [the] State doesn=t have any problem with
redacting the blue [typewritten] that you=ve highlighted, then that=s fine. . . .  The handwritten part talks about both Boo and
T.T. so I don=t know how I can take
that out because I can=t distinguish which one
we=re talking about.  She=s saying both of them.

 

The parties agreed to redact ABoo N@ from
the handwritten portion of the statement.

[State=s counsel]:  We=re going to ask that it
beC63-B at this point be
admitted for all purposes with the caveat that we=re going to clean it up or the jury never gets to
hold on to it . . . until we=ve whited everything out.

 

The Court:  All right . . .
.  Publish it by reading?

 

[State=s counsel]:  Yes. . . . 
Anything that=s in purple doesn=t get read.

 

[Defense counsel]:  [Detective
Waters] will read, excepting the purple stuff.

 

[State=s counsel]:  And that=s what I=m going to go tell her while you have [Detective]
Carroll on the stand.

 

The Court:  All right.  Who=s next?

 

[Defense counsel]:  That=s fair.

 

The Court: That=s fair.  All right. 
Let=s get them in.

 

[Emphasis added.]  Subsequently, without objection, Detective
Waters published the redacted version of Abbs=s
statement, State=s Exhibit 63-B, by reading it to
the jury.








It is
apparent from the record that the jury only received State=s
Exhibit 63-B.[8]  Because Stevenson failed to object to the
admission and publication of the redacted statement for all purposes, we
conclude that the errors now complained of were not preserved.  See Tex. R. App. P. 33.1(a); Leday,
983 S.W.2d at 718; Johnson, 803 S.W.2d at 291; see also Curry v.
State, 910 S.W.2d 490, 496 & n.2 (Tex. Crim. App. 1995) (stating that
constitutional errors can be forfeited). 
We overrule Stevenson=s third
issue.

D.  Daubert Objection

In his
final issue, Stevenson complains that the trial court erred by allowing
Fredericks, the State=s forensic video analysis
expert, to testify as an expert under rule 702 of the Texas Rules of Evidence.

Rule 702
states,








If scientific, technical, or other specialized knowledge will assist
the trier of fact to understand the evidence or to determine a fact in issue, a
witness qualified as an expert by knowledge, skill, experience, training, or
education may testify thereto in the form of an opinion or otherwise. 

 

Tex. R. Evid. 702.  Thus, before admitting expert testimony under
rule 702, the trial court must be satisfied that three conditions are met:  (1) the witness qualifies as an expert by
reason of his knowledge, skill, experience, training, or education; (2) the
subject matter of the testimony is an appropriate one for expert
testimony;  and (3) admitting the expert
testimony will actually assist the factfinder in deciding the case.  Rodgers v. State, 205 S.W.3d 525, 527
(Tex. Crim. App. 2006).

Furthermore,
a trial court need not exclude expert testimony simply because the subject
matter is within the comprehension of the average jury.  See id. & n.7.  That is, if the witness has some special
knowledge or additional insight into the field that would be helpful, then the
expert can assist the trier of fact to understand the evidence or to determine
a fact in issue.  Id. at 527. An
expert may add precision and depth to the ability of the trier of fact to reach
conclusions about subjects that lie well within common experience.  Id. Because the possible spectrum of
education, skill, and training is so wide, a trial court has great discretion
in determining whether a witness possesses sufficient qualifications to assist
the jury as an expert on a specific topic in a particular case.  Id. at 527B28.








The
court of criminal appeals has set out the following criteria to consider in
assessing whether a trial court has abused its discretion in ruling on an
expert=s
qualifications:

First, is the field of expertise complex?  The degree of education, training, or
experience that a witness should have before he can qualify as an expert is
directly related to the complexity of the field about which he proposes to
testify.  If the expert evidence is close
to the jury=s common understanding,
the witness=s qualifications are less
important than when the evidence is well outside the jury=s own experience. . .
.  Second, how conclusive is the expert=s opinion?  The more conclusive the expert=s opinion, the more
important is his degree of expertise. . . .  And third, how central is the area of
expertise to the resolution of the lawsuit? 
The more dispositive it is of the disputed issues, the more important
the expert=s qualifications are. 

 

Id. at 528
(internal citations omitted).








During
the Daubert hearing, Fredericks testified that he had a degree in
broadcast telecommunications, that he was an instructor at the FBI National
Academy for forensic video analysis, and that for over twenty years, he had been
a forensic video analyst doing forensic video analysis work worldwide.  He defined Aforensic
video analysis@ as Athe
scientific examination, comparison[,] and evaluation of video in legal matters.@  He also described two of the FBI=s
scientific working groups in the field of forensic video analysis, the Scientific
Working Group on Imaging Technology and the Scientific Working Group on Digital
Evidence, and explained that the purpose of such working groups was to
establish standards for the processing of analog and digital video evidence.  He testified that he had published articles
regarding forensic video analysis that were subject to peer review, that he had
testified as an expert in forensic video analysis in the United States and
Canada, and that he had co-authored ABest
Practices for the Acquisition of Digital Multimedia Evidence,@ the
standard for the acquisition of digital video evidence.  He testified that Aany
analyst with the appropriate training could take [his] written report [in this
case] and all of the data and reproduce [his] work exactly from them.@

Fredericks
aligned the material on the surveillance videotapes with the three different
911 audio sources and explained that in forensic video analysis parlance, an Aartifact@ was Aanything
that is produced by the video signal that . . . was not . . . part of the
camera=s
view[;] . . . elements of the image, because of the tape medium, where there=ll be
flashes of light . . . [or] dark areas that need to be processed@ to
determine whether they were errors in the video signal or actually an object
there in the scene.

Defense
counsel asked, with regard to Fredericks=s
expertise in observing video, A[I]s
there any tool, forensic tool, that you used to form that opinion [that three
males were involved in the robbery, one had a handgun, and one removed bills
from the cash drawer] other than fixing the image, making it still or playing
it over and over again?@ 
Fredericks responded, 








Yes. . . .  I=m able
to track the motion of [the gunman=s]
hand.  For instance, inCin this
particular case my experience . . . is that when I explain to somebody here is
the person entering.  The person I=m
showing goes, [A]Wait, I don=t see
the person entering.[A] So we=ll very
carefully say this area of darkness is a body entering the image.  And then I can track it and explain what
imageCfor the
record, with the number, what image it starts on, where the person goes
to.  And then I say, [AS]ee
here is the gun coming out,[A] the
person I=m
describing to goes, [A]I don=t see a
gun.[A] So
then I circle it, I point it out, and then I track it.  And they go[,@N]ow I
see the gun.[A] . . . .  

My
experience is after examining tens of thousands of videotapes, providing this
kind of evidence as a forensic video expert throughout North America in over 60
cases like this, the layperson does not see what I see until I explain it.  YouCto show
it still image and to sayCto step back and let a layperson
assess what is on the image, they won=t see
five percent of what I see . . . .  [M]y experience is that aCa
layperson cannot appreciate what they are looking at unless it=s fully
and clearly explained to them.








Fredericks
acknowledged that the tape quality was a poor, black-and-white video and
explained that he determined what was money by going back on the videotape
several hours and watching multiple transactionsCA[s]o
with multiple transactions in typical convenience store setting, . . . it was
my opinion that . . . that was money.@  He testified that he sends a number of his
cases for peer review but that he did not recall whether he sent this
particular case.  He acknowledged that
one particular eventCthe conclusion that someone was
taking money from a cash drawerCwould be
a common sense observation and that he was not aware of any publication that
described the process of looking at video, stopping the images, and forming
such opinions.  However, he also pointed
out that the value of the opinion was in figuring out Awhat=s in the
box,@ i.e.,
how one would determine that the box contained moneyCA[t]hat
would be something that I could assist the trier of fact to answer ifCif that
question isCarises.@  He testified that photographic and video
comparison is the examination and comparison of a known object to a questioned
objectCin this
case, Ais that
box that was seen on video, that was removed from the counter, the same box
that was photographed on April of 2005? 
And in its position, its size, location, shape, and other features, in
fact, I formed the opinion that that is the same box.@








In the
first portion of his complaint, Stevenson argues that Fredericks should not
have been allowed to testify as an expert under rule 702 because Athere
was no underlying theory to support, nor novel scientific methodologies to
support the findings@Cthat is,
he complains that what Fredericks testified to Awas
mechanical manipulation of videos and tapes.@  However, this argument does not comport with
the ones made at the Daubert hearing, in which Stevenson stated, AJust so
I=mCI=m clear
on what I=m complaining about and I=m not
complaining about.  I=m not
complaining about theCthe
display of the videos, the three different views that are the result of his
work and his processing, filtering, analyzing, and so forth. . .
.  I have no quarrel he=s an
expert in many areas of video analysis.@  [Emphasis added.] See, e.g., Heidelberg v.
State, 144 S.W.3d 535, 537 (Tex. Crim. App. 2004) (stating that it is well
settled that the legal basis of a complaint raised on appeal cannot vary from
that raised at trial).  Therefore, we
overrule this portion of Stevenson=s fourth
issue.

Despite
the several objections Stevenson made to Fredericks=s
testimony during the Daubert hearing and at trial, his only specific
complaint on appeal, set out A[a]s an
example for the proposition that Fredericks is not an expert,@ is that
State=s
Exhibit 64, Fredericks=s report of his investigation,
forces a conclusion that it is not an expert opinion:

Page 000515 of the report shows
a AMeasurement
Standard@ which
Fredericks placed in the store in an appropriate location after the fact and
then superimposed the actual video over it to show the relative height of one
of the robbers against the AMeasurement
Standard@ as
shown in the stills on page 000516. 
Fredericks[>s] conclusion was that Male No.
1 is taller than 5>8>=.  This conclusion is not an expert opinion, nor
the results of a test of the underlying theory, nor the results of the novel
scientific methodology used.  It was
merely an observation which could have been made by a lay person with some
fancy equipment.








However,
Fredericks testified during the Daubert hearing that Apart of
the subdiscipline of forensic video analysis includes height comparison of
individuals . . . [by] going back to the scene, calibrating the camera, and
taking a height standard, and placing it back where one of the individuals was
standing,@ so that he could provide some
information about height.  He testified
that he did not make estimates of the individuals=
heights, i.e., how tall they were, but instead made observations about their
comparative heights.








        Having
reviewed the videotape evidence, with regard to this complaint, we conclude
that the trial court did not abuse its discretion by allowing Fredericks to
testify as an expert because it could have concluded, based on Fredericks=s
testimony at the Daubert hearing, that Fredericks was an expert in
forensic video analysis, that the subject matter was appropriate for his
testimony, and that admitting Fredericks=s
testimony would actually assist the jury in deciding the case.  See 
Rodgers, 205 S.W.3d at 527. 
That is, the trial court could have reasonably concluded that even
though the jurors could see for themselves the sequence of events at Terry=s Food
Mart on the videotape, Fredericks=s
testimony could help clarify what they were seeing on the poor-quality
black-and-white video, particularly with regard the comparison of the
individuals= heights.  See, e.g., Lerma v. State, No.
14-98-00977-CV, 2000 WL 123768, at *5 (Tex. App.CHouston
[14th Dist.] Feb. 3, 2000, pet. ref=d) (not
designated for publication) (holding that it was not ineffective assistance of
counsel to fail to object to qualifications of expert witness who testified
concerning measurements made at the murder scene and his extrapolations of the
height of one of the assailants from those measurements); cf. Gonzales v.
State, No. 02-04-00466-CR, 2006 WL 820387, at *2B4 (Tex.
App.CFort
Worth Mar. 30, 2006, pet. ref=d) (mem.
op., not designated for publication) (finding harmless error when the trial
court allowed expert to narrate videotape for the jury because Athere is
no evidence that Fredericks had any special training in a field that qualified
him to offer an expert opinion as to what appellant=s intent
was in gesturing to the gunman . . . [and] the jury did not need [his]
assistance to determine appellant=s intent@).  We overrule Stevenson=s final
issue.

V. 
Conclusion

Having
overruled all of Stevenson=s
issues, we affirm the trial court=s
judgment.

 

 

BOB MCCOY

JUSTICE

 

PANEL: LIVINGSTON, MCCOY, and MEIER, JJ.

 

PUBLISH

 

DELIVERED: January 14, 2010

 











[1]Because Stevenson
challenges the legal and factual sufficiency of the evidence to sustain his
murder conviction, we will review the facts of this case in greater detail
below.  





[2]The State also refers us
to Otting v. State, 8 S.W.3d 681, 686B87 (Tex. App.CAustin 1999, pet. ref=d, untimely filed), which
involved the estoppel rule as applied to factual sufficiency.  Per McKinney, it is inapposite.  See 207 S.W.3d at 374. 





[3]Both testified that they
had spent time in prison.  The last time
Patrick was in trouble with the law was in 1991; Brenda=s last time was in 1987. 





[4]He testified on
cross-examination that he did not collect the Pepsi bottle that had spilled
onto the floor, or the paper towels nearby, or any shoe imprints, and that he
did not fingerprint the Pepsi bottle.





[5]Abbs testified that she
had a bad memory because she had seizures and Awas in a coma like three
months ago@ and almost died.  She testified that when she Acame out of it,@ she did not remember her
social security number and barely remembered some family members.





[6]Stevenson=s trial counsel
acknowledged that the motion was Afairly close to . . . one that a lawyer would
draft.@  The trial court agreed, stating, ANo doubt about it.  I mean, he just put more in it than he should
have put i[n] i[t].@





[7]The trial court included
an instruction on impeachment in the jury charge. Neither party objected to its
inclusion.  Stevenson argued that
instruction applied to Abbs=s statement during his closing argument. 





[8]After beginning
deliberations, the jury requested both Abbs=s and Bivens=s written statements, and the parties held the
following conversation:

 

The Court:  The note says, [A]We would like to review
the written statement of Ms. Abbs and Ms. Bivens the night they were brought
down to the station . . . . 

 

[Defense counsel]:  That=s State=s Exhibit 63-B, which is the whited out version
of Shawntee Abbs.  That=s fine, Judge.